# 14-1843-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

AYDA HUSAM AHMAD, Individually, HASSAN MOHAMMED, Individually, BASSAM GHAYYADA, Individually, AIMAN HOSSAN, Individually, JAMILA ABDEL HAY, Individually, M.H., A minor, by his father and natural guardian AIMAN HOSSAN and his mother and natural guardian JAMILA ABDEL HAY, E.H., A minor, by his father and natural guardian AIMAN HOSSAN and his mother and natural guardian JAMILA ABDEL HAY, MAYOR ABDELKARIM BSHARAT, Representative of JABAA MOSQUE, FATHER ARCHIMADRITE CLAUDIUS, Representative of MONASTERY OF THE CROSS, NEMER FATHI, Individually, MONIR QADOUS, Individually, NAJEH SAFADI, Individually, BOROSOLI EID, Individually,

*Plaintiffs-Appellants,*

—against—

CHRISTIAN FRIENDS OF ISRAELI COMMUNITIES, THE HEBRON FUND, INC, CENTRAL FUND OF ISRAEL, ONE ISRAEL FUND, LTD, AMERICAN FRIENDS OF ATERET COHANIM, INC,

*Defendants-Appellees.*

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

LOUIS G. ADOLFSEN
MICHAEL F. PANAYOTOU
S. DWIGHT STEPHENS
MELITO & ADOLFSEN P.C.
233 Broadway, 10th Floor
New York, New York 10279
(212) 238-8900

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................. iii

JURISDICTIONAL STATEMENT ...................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......... 1

STATEMENT OF THE CASE .............................................. 2

STATEMENT OF FACTS .................................................. 4

The U.S. Citizen ATA Plaintiffs ........................................ 4

The Alien ATS Plaintiffs .................................................. 5

The U.S. Charity Defendants ............................................ 7

Christian Friends of Israeli Communities ................................ 7

The Hebron Fund .......................................................... 8

Central Fund of Israel .................................................... 9

Defendant One Israel ...................................................... 9

Defendant American Friends of Ateret Cohanim ........................ 10

The Attacks ................................................................ 10

The Yitzhar Settlement .................................................... 11

The Settlers' "Price Tag" Attacks ........................................ 12

STANDARD OF REVIEW .................................................. 13

SUMMARY OF ARGUMENT .............................................. 13

i

ARGUMENT ................................................................ 17

POINT I

Plaintiffs Plausibly Pled that Defendants Are Providing
    Material Support to Terrorists Under the ATA ...................... 17

POINT II

Defendants' U.S.-Based funding of the Settler Groups Supports
    Jurisdiction Under the ATS.............................................. 25

POINT III

The U.S. Supreme Court Overruled This Court's Decision in
    *Kiobel, sub silentio* ..................................................... 31

CONCLUSION ........................................................... 35

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Abecassis v. Wyatt*,
    704 F. Supp. 2d 623 (S.D. Tex. 2010) ............................... 23

*Almog v. Arab Bank, PLC*,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ............................... 27, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......... 18

*Baloco ex rel. v. Drummond Co., Inc.*,
    640 F.3d 1338 (11th Cir. 2011) ...................................... 35

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................. 13, 17, 20

*Boim v. Holy Land Foundation for Relief and Development*,
    549 F.3d 685 (7th Cir 2008) .........................................*passim*

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .......................................... 13

*Cleveland v. Caplaw Enterprises*,
    448 F.3d 518 (2d Cir. 2006) .......................................... 13

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C. Cir. 2011) ......................................... 34

*Flomo v. Firestone National Rubber Co., LLC*,
    643 F.3d 1013 (7th Cir. 2011) ........................................ 34

*Gill v. The Arab Bank*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................ 22

*Gill v. Arab Bank, PLC*,
    891 F. Supp. 2d 335 (E.D.N.Y. 2012) ................................ 23

iii

PAGE

*Gilmore v. The Palestinian Interim Self-Gov't Auth.*,
422 F. Supp. 2d 96 (D.D.C. 2006) .................................... 18

*In re Chiquita Brands Intern., Inc. Alien Tort Statute
and Shareholder Derivative Litigation*,
792 F. Supp. 2d 1301 (S.D. Fla. 2011) ............................. 27

*In re S. African Apartheid Litig.*,
02 MDL 1499 SAS, 2014 WL 1569423
(S.D.N.Y. Apr. 17, 2014) ........................................... 31, 32

*In re Terrorist Attacks on September 11, 2001*,
714 F.3d 109 (2d Cir. 2013) ........................................ 21, 28

*Iqbal v. Hasty*,
490 F.3d 143(2d Cir. 2007) *rev'd on other grounds sub nom.
Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009).............................. 13

*Keel v. Hainline*,
331 P.2d 397 (Okla. 1958) ........................................... 25

*Kiobel v. Royal Dutch Petroleum Co.*,
__ U.S. __, 133 S. Ct. 1659, 81 USLW 4241 (2013) ........... 17, 31, 33

*Morrison v. National Australia Bank, Ltd.*,
561 U.S. 247 (2010) ................................................... 33

*Presbyterian Church of Sudan v. Talisman Energy*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) ............................... 29

*Presbyterian Church Of Sudan v. Talisman Energy, Inc.*,
582 F.3d 244 (2d Cir. 2009) ........................................ 25, 26

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) .......................................... 20, 28

*Sarei v. Rio Tinto, PLC*,
671 F.3d 736 (9th Cir. 2011) *vacated and remanded on
extraterritoriality issue in light of Kiobel Supreme Court
decision,* 133 S.Ct. 1995 (2013)....................................... 35

PAGE

*Strauss v. Credit Lyonnais, S.A.*,
  249 F.R.D. 429, 2013 WL 751283 (E.D.N.Y. 2013) ...............  19

**Statutes**

18 U.S.C. § 2333 ........................................................ *passim*

28 U.S.C. § 1350 ........................................................ *passim*

28 U.S.C. Section 1291 ..................................................  1

**Rules**

Rule 12(b)(6) of the Federal Rules of Civil Procedure ................. *passim*

Rule 3 the Federal Rules of Appellate Procedure ....................... 1

## Jurisdictional Statement

The District Court has subject matter jurisdiction of the claims made in this action by the two plaintiffs who are U.S. Citizens under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and jurisdiction of the claims brought by the non-U.S. plaintiffs under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. This Court has jurisdiction under Rule 3 the Federal Rules of Appellate Procedure because the granting of the motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure by the District Court is a final order under 28 U.S.C. Section 1291 which disposes of all of the parties' claims.  The Order of the District Court was issued on May 5, 2014 (A-95),[1] and plaintiffs filed their Notice of Appeal on May 25, 2014 (A-106 to A-107).

## Statement of the Issues Presented For Review

Did the District Court err in dismissing the complaint, instead of allowing discovery, as to the two U.S. citizen plaintiffs attacked by Israeli settlers in the West Bank who seek to recover monetary damages against the defendant U.S. charities for knowingly or with knowing indifference providing material support to terrorism as defined in the ATA based on the detailed allegations in the complaint that defendants give to specific groups of violent settlers?

---

[1] Citations to the Appendix appear as "A-__."

Did the District Court err in dismissing the complaint, instead of allowing discovery, as to the Greek and the Palestinian plaintiffs who seek to recover under the ATS because defendants' shared purpose with Israeli settler groups of taking back Judea and Samaria by any means, including violence, violates International Law?

Did the District Court err in holding that this Court's decision in *Kiobel* that claims cannot be brought against corporations under the ATS is binding on it?

## Statement of the Case

In this case, the U.S. plaintiffs allege that the five defendant U.S. Charities are providing material support to terrorism as defined in the ATA by sending funds to specific Israeli settler groups whose members attack non-Jews in the West Bank. The alien plaintiffs allege that this same funding supports defendants' shared plan with the Settlers to drive the non-Jewish civilian population out of the West Bank and Jerusalem in violation of international law and supports jurisdiction under the ATS. Since the charitable donations are collected in the United States, the alien plaintiffs' claims do not seek an extraterritorial application of the ATS.

The defendants moved to dismiss under Rule 12(b)(6). They asserted that the claims under the ATA should be dismissed because the U.S. plaintiffs failed to show that defendants had the requisite *scienter* to establish that they intended or were indifferent to the harm caused to the plaintiffs. They also argued that the

U.S. plaintiffs failed to show that the funds they provided to the Israeli settlers were a proximate cause of the violence committed by the Israeli settlers.  The defendants also moved to dismiss the claims by the alien plaintiffs under the ATS on the grounds that the conduct of the Israeli settlers did not violate international law. The defendants also asserted that the law of this Circuit is that a corporation cannot be sued under the ATS.

The U.S. plaintiffs opposed the motion to dismiss the ATA claim arguing that the complaint specifically alleged that defendants possessed the requisite *scienter* because it is widely known that the Israeli settlers whom they support attack non-Jews and that the defendants are, at best,  indifferent to this violence. The U.S. plaintiffs also argued that proximate cause was established by the direct funding of the settlers and settler groups who attack non-Jews.  The alien plaintiffs asserted that they have shown in their pleading that the same conduct that violates the ATA is a violation of international law for jurisdictional purposes under the ATS.  Finally, defendants argued that the U.S. Supreme Court overruled, *sub silentio,* this Court's holding that claims cannot be brought against corporations under the ATS.

On May 5, 2014, Israeli Independence Day, United States District Court Judge Jesse Furman issued an order granting  defendants' motion to dismiss under Rule 12(b)(6). 2014 WL 1796322.

## Statement of Facts

This is a civil action for a money judgment brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 and the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, arising from a series of terrorist attacks on civilians (A-13 to A-14).

Two of the plaintiffs are U.S. citizens who seek to recover under the ATA for personal injury and property damage. The remaining plaintiffs are nonresident aliens who seek to recover under the ATS for personal injuries and property damage caused to them by Settlers in the West Bank from Defendants who operate charities in the United States where they collect U.S. donations which provide support to violent Israeli settlers (A-14).

### The U.S. Citizen ATA Plaintiffs

Plaintiff Aydu Husam Ahmad, a U.S. citizen, who lives in Sinjel a village northeast of Ramallah near the Israeli settlement of Shilo, was attacked several times by the Settlers. The latest attack was in May 21, 2012 where he was stoned by the Settlers when he tried to protect his olive trees from being uprooted (A-17).

Plaintiff Hassan Mohammed, a U.S. citizen, lives in Huwara village, south of Nablus City near the Yitzhar settlement in the northern West Bank. In February of 2011, Settlers threw Molotov cocktails at his house, burning two floors and breaking all of the windows in the front of the house. In June of the same year, Settlers burned a field of olive trees on his property in Nablus. As recently as

April 15, 2013, a group of Settlers again attempted to break the windows of Mr. Mohammed's house and menaced him (*Id.*).

**The Alien ATS Plaintiffs**

Plaintiffs Bassam Ghayyada, Aiman Hossan, Jamila Abel Hay, M. H., and E.H. (two minor children of Aiman Hossan and Jamila Abel Hay) are Palestinian citizens who were seriously injured in a firebomb attack carried out by Settlers. They were traveling in a taxi on August 16, 2012 when a firebomb was thrown into the taxi outside the Gush Etzion settlement of Bat Ayin near Beit Lahem. The yellow taxi with a Green Palestinian license plate, typical of Palestinian taxis, could not have been mistaken for anything but a vehicle containing Palestinians. Four of the victims were hospitalized with second and third-degree burns while the fifth, Aiman Hossan, was in intensive care for over two months. Israeli officials said that Israeli Settlers were behind the attack, which took place near the Jewish settlement of Bat Ayin. The U.S. State Department declared this firebombing a terrorist act (A-18).

Plaintiff Mayor Abdulkarim Bsharat, a U.S. resident and a Palestinian citizen, is the Mayor and Sheikh of Jabaa, a village about five miles from both Jerusalem and Ramallah near the Ulpana settlement. The mosque in the village was burned and vandalized on June 19, 2012 with graffiti warning in Hebrew of a "war" over the impending evacuation of the small, disputed Jewish settlement of

Ulpana. Mickey Rosenfeld, as spokesman for the Israeli police, said that several suspects entered Jabaa, broke a large window in the mosque, and set a fire that burned a large section of a carpet and a wall (*Id*.).

Plaintiff Father Claudius Archimandrite, a citizen of Greece, is the Superior of the Greek Orthodox Monastery of the Cross located in a park southeast of the Israeli museum and the Knesset, which was attacked on December 12, 2012. The attack was the latest in a series of vandalisms of Christian holy sites. Vandals have also spray-painted three vehicles that belong to the monastery. The cars were vandalized with the spray-painted messages "Jesus, son of a whore," "Price Tag," and "Victory for the Maccabees," a reference to a biblical victory of Jews over Greeks (A-19).

Plaintiff Nemir Fathi is a Palestinian citizen from Asira al-Qibliya, a village of the northern Occupied Palestine, who was shot by a Settler from Yitzhar settlement (*Id.*).

Plaintiff Monir Qadous is from Nablus and was attacked and beaten by Settlers near Route 60, close to the Yitzhar Settlement (*Id.*).

On May 26, 2012, Plaintiff Najeh Safadi, also from Nablus, was shot and wounded in a clash that began when some twenty-five Settlers from Yitzhar, several carrying arms, set fire to wheat fields and an olive grove near the village of Orif in the Northern West Bank. He was handcuffed by a guard from Yitzhar-

6

settlement, who threw him to the ground and shot him while other Settlers kicked him.   Although an Israeli military spokesman confirmed that a Settler shot and wounded a Palestinian and that the army would investigate the incident and the victim identified the attacker at the police station, no charges were filed (*Id.*).

On April 19, 2012 at about 2:30 p.m. more than 15 Settlers walked onto the land of Plaintiff Borosoli Eid, a Palestinian policeman from Burin village in the northern West Bank near the Yitzhar settlement.   They were shooting stones with slingshots.   When they got closer to Officer Eid, one of them shot him twice with a firearm, one bullet striking him in the hand and the other in the leg.    He was hospitalized and had surgery on his arm.   Mr. Eid identified two of the assailants in a police lineup in the Ariel station.   He moved away and built a new house but he reported that the attacks continued: "Twice they burned the house and four times they tried to stop the construction. They smashed tiles and cinderblocks and tried to break the foundation pillars. They burned the logs for building the roof. I fear for my children. Every night I am afraid they [the assailants] will come back again." (A-20).

### The U.S. Charity Defendants

## Christian Friends of Israeli Communities

Defendant Christian Friends of Israeli Communities ("CFOIC") shares the purpose of the Settlers, stating on its website:

7

> Judea and Samaria is the Biblical name for the Center of the Holy Land also called the Mountains of Israel. The media refers to this area as the 'West Bank.' The residents of these areas otherwise referred to as 'Settlers' are fulfilling prophecy and pointing the way for the rest of the Jewish people back to their roots. (A-20)

The website also states:

> Christian Friends of Israeli Communities (CFOIC) was established in 1995 in response to the Oslo Process. Christians around the world were deeply troubled by Israel's major territorial concessions and felt drawn to the people that stood on the forefront of Israel's territorial battle – the people of Judea and Samaria. CFOIC provided a much needed vehicle for Christians to become better informed about events in Israel particularly with regard to Jewish communities in the heartland of Biblical Israel to visit these areas and become personally connected to the people living there and to provide practical support for vital community needs. (A-21)

**The Hebron Fund**

Defendant Hebron Fund, Inc. ("The Hebron Fund") states on its website that a "primary goal of the organization is the raising of capital for the improvement of daily life for the residents of Hebron, Israel." (A-21). Despite the stated purpose and goal of the Hebron Fund on its website, various journalists have reported that, while there is no evidence directly linking the Fund's activity to Settlers' attacks on Palestinians, the Hebron Fund may support Settler violence for example by paying legal fees for Settlers arrested in connection with attacks. The Hebron Fund stands out because of its support for a militant fringe of the Settler

8

movement.  Public records in the U.S. and Israel show that the Hebron Fund uses funds from American donors to support the activities of specific Settlers who have been convicted of deadly armed attacks on Palestinians in the past (A-20 to A-21).

One of the founders of the Hebron Settlers' Organization which received Hebron Fund money, Ze'ev Friedman, was convicted in connection with a pair of car bombings, targeting the mayors of two Palestinian cities (A-21 to A-22).

**Central Fund of Israel**

Defendant Central Fund of Israel ("the Central Fund"), as reported in a July 2010 New York Times article, is:

> A prominent clearing house . . . operated from the Marcus Brothers' textile offices in the Manhattan Garment District.  Dozens of West Bank groups seem to view the Fund as little more than a vehicle for channeling donations back to themselves, instructing their supporters that if they want a tax break they must direct their contributions there first. (A-22)

The Central Fund openly shares the purpose of the Settlers, stating that it is providing funds for guns and ammunition and other equipment for the Settlers needed to facilitate protection of the land and their attacks on Palestinians who venture anywhere near the settlements (A-22).

**Defendant One Israel**

Defendant One Israel Fund, Ltd. ("One Israel") states on its website that it is providing security for the Settlers:

Improving the security of every community in town in Judea and Samaria is the heart and soul of One Israel Fund's mission.  In light of the recent budget cuts that have been made to the IDF and the cutback of checkpoints allocated to protect these communities the security resources and training we provide is paramount to the future of these areas.  (A-23)

## Defendant American Friends of Ateret Cohanim

Defendant American Friends of Ateret Cohanim ("Ateret Cohanim") reports to the IRS that it is funding day camps and nurseries, housing renovation and repair, security equipment, seminars, newsletters and tours which are charitable purposes (A-23).  However, guests who attend annual dinners are told that the goal is to "promote the political goals of 'strengthening, securing, and keeping Jerusalem united'" by the use of the Jerusalem Reclamation Project which funds the purchasing of buildings in Jerusalem (*Id.*).

## The Attacks

For the most part, plaintiffs have been unable to identify specific individual attackers or, as indicted above, when they do, no charges have been filed by the Israeli authorities so that the individual's names remain unknown.  However, the plaintiffs in this case live near specific "struggling outposts and isolated settlements, inhabited by militant settlers,"[2] which are the particular object of

---

[2] Rutenberg, J. McIntire and E. Bronner, Tax-Exempt Funds Aid Settlements in West Bank, *The New York Times,* http://www.nytimes.com/2010/07/06/world/middleast/06settle.html. p. 3 of 13.

defendants' donations as distinguished from established non-violent settlements. Many of the attackers come from the Yitzhar settlement and the "price tag" attacks take place mainly in Hebron, Jerusalem and, of course, Nablus.

**The Yitzhar Settlement**

Yitzchak Ginsburg is the head of Od Yosef Chai Rabbinical College, in the Yitzhar settlement South of Nablus, which operates two Yeshivas, a seminary and a publishing house, and on its website praises the 'hilltop youth' who have carried out hundreds of terrorist attacks against Palestinians (A-26). Settlers in the Yitzhar Settlement are and were radical Jews who view the Palestinians as their enemies. Rabbis Yitzchak Ginzburg and Yitzhak Shapira have both published books and pamphlets advocating the killing of non-Jews, denying Arabs the right to exist, and praising mass murderer Baruch Goldstein, who opened fire on a group of Muslim worshipers in Hebron in 1994, killing 29 and wounding 125 (*Id.*).

The Settlers of Yitzhar sought, as an official and publicly stated policy and goal, to murder or expel the Palestinian residents and, since its founding and until the present day, Settlers of Yitzhar have used terrorism against Palestinians in the West Bank to coerce, intimidate, and influence the Israeli government and public and thereby ultimately bring the expulsion of the Palestinian residents from the West Bank (*Id.*).

**The Settlers' "Price Tag" Attacks**

The Settlers have openly, publicly and repeatedly acknowledged having a policy that is referred to as "Price Tag" attacks. "Price Tag" is a term used to describe acts of vandalism by radical Israeli Settlers exacting in "price" against Palestinian targets or Israeli security forces in response to actions by the Israeli government. Most of the Settler attacks take place in areas where Israel has security jurisdiction under the Oslo Accords (A-29).

In one illustrative incident, a group of Settlers arrived at the village of Jabaa after midnight and broke one of the windows of the mosque and threw flammable material, burning a carpet, a door and window. Graffiti was written on the wall reading "Ulpana," "The war has started" and "Price Tag." It was part of a series of attacks carried out by Settlers from Ulpana in retaliation after Israel's Supreme Court ruled that Ulpana was constructed on Palestinian private land (*id*.).

In a May 2013 article by Ynet News, in apparent response to Palestinian and international outcry, the Israeli Minister of Justice and the Public Security Minister called for meetings to be conducted among members of the Israeli Cabinet to declare that the "Price Tag" attacks are acts of terrorism (*id*.). A U.S. State Department annual report on terrorism in foreign countries declared so-called "Price Tag" attacks against Palestinians in the West Bank to be "terrorist incidents." (A-27)

## Standard of Review

The standard of review for an appeals court from a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is *de novo. Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002). In reviewing a motion to dismiss under Rule 12(b)(6), courts must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 521 (2d Cir. 2006). The plaintiff must satisfy a "flexible 'plausibility standard.'" *Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009). "[O]nce a claim has been stated adequately, it may be supported by any showing of a set of facts consistent with the allegations of the complaint." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 (2007). Therefore, courts do not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

## Summary of Argument

The District Court dismissed the complaint on the pleadings, without allowing any discovery, based on its conclusion that plaintiffs had not alleged that defendants knew that the funds they supplied would be used to carry out terrorist attacks or that the their funding was a proximate cause of the attacks. The Court applied the analysis of the Supreme Court which, to defeat a 12(b) (6) motion,

13

requires that plaintiffs must allege "more than a sheer possibility that a defendant has acted unlawfully" and that they "must have nudged their claims across the line from conceivable to plausible."

The complaint plausibly, and vividly, alleges in detail, as expressed in newspapers and defendants' own websites, defendants' intimate knowledge and support for the Settlers' goal of taking most or all of the West Bank and Jerusalem and making it part of Israel. It also alleges the strong causal connection between the defendants' funding and the actions of the Settlers, including the attacks on non-Jews, as a result of their funding all of the activities of the Settlers. The complaint states a cause of action under both the ATA and the ATS. We respectfully request that this Court reverse the order of District Court and allow discovery to proceed.

Over the last year, this Court has dismissed ATA and ATS cases on the pleadings because the allegations did not show a sufficient connection between the financial transaction and terrorism. This case is not, for example, like a case recently dismissed by this Court where a bank wired funds in violation of law to an account of a foreign country that supports a well-known terrorist organization because it was not shown that the funds went directly to the terrorists and the country receives funds from many sources to support governmental functions not involving terrorism.

14

This case is far different. Charities support many causes. Some charities support Christian causes. Some support Jewish causes. These charities support those who want to take West Bank land from the people who live there and they engage in violence as part of that plan.

In this case, the defendants wire funds directly to the settler groups who attack non-Jews. The pleadings in this case are not based on conjecture or supposition as to how an organization might have been behind a terror attack. Most cases under the ATA allege violence by Arabs against Jews. Many ATS cases allege that commercial enterprises provided financial support to governmental violence condemned by international law. Very few of the ATA or ATS cases are dismissed on the pleadings. The cases dismissed were those that alleged attenuated and speculative connections between the defendant financiers and the acts of terrorism. None are remotely like this case. The defendant charities here are alleged to provide unconditional financial support to particular settler groups in the West Bank for the shared purpose that they, the charities, see as a just cause—the taking of The Holy Land from non-Jews – without regard for whether those they support engage in violence. The District Court saw no distinction between those cases and this one, and found the complaint lacking in detail and implausible. This was error.

The complaint is detailed and plausible. It begins by describing the attacks on the plaintiffs and describes the town or area where the attackers live. The complaint then quotes from newspapers and defendants' own websites, which refer to Israel's "territorial concessions" in Judea and Samaria," boasting that one defendant pays the legal fees for Settlers arrested in attacks, that settler organizations directly financed by the defendants have founders convicted of attacks, that some defendants provide funds for the Settlers to buy guns and ammunition, and that budget cuts for the Israeli Defense Force ("IDF") require arming the Settlers.  The complaint also names the specific settlements where the attacks take place and those settlers who advocate the killing of non-Jews.  The complaint describes the commonly used references to some of the attackers, such as the Hilltop Youth who have carried out hundreds of attacks on Palestinians, and the "price tag" attacks which some members of Israel's government have called acts of terrorism.  Plaintiffs dispute the District Court's conclusions that these detailed allegations do not show that defendants, who are intimately connected financially, politically, and personally with the Settlers, meet the required knowledge, causation and purpose to impose liability under both the ATA and the ATS.

That the Israeli Settlers in the West Bank have not been designated as Foreign Terrorist Organizations ("FTOs") does not matter.  The broad reach of the

ATA does not require that the recipient of the funding be an FTO. The U.S. Plaintiffs have alleged that these attacks, just like attacks by FTOs such as Hamas, are intended "to intimidate or coerce" the non-Jewish civilian population.  This conduct fits squarely within the definition of terrorism under the ATA.  The non-American plaintiffs seek to invoke jurisdiction under the ATS and recover in tort for the same kinds of terrorist acts  for defendants' U.S.- based financing of this violence  in violation of international law.  *Kiobel v. Royal Dutch Petroleum Co*. __ U.S. __, 133 S. Ct. 1659, 81 USLW 4241 (2013).

The case may proceed under the ATS because the United States Supreme Court overruled, *sub silentio,* this Court's decision that claims cannot be brought against corporations under the ATS, as can be gleaned from a review of the first oral argument in *Kiobel* and inferred from the treatment of claims against corporations in later cases from the Supreme Court and other courts.

## ARGUMENT

### Point I

### Plaintiffs Plausibly Pled that Defendants Are Providing Material Support to Terrorists Under the ATA

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007), the Supreme Court announced the standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure as, if the plaintiffs have  "not nudged their claims across the line from conceivable to plausible,"  the complaint

17

should be dismissed. In a later case the Court added that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

The District Court imposed a higher pleading burden on plaintiffs in this case than other Courts have required under the ATA. A good illustration is *Gilmore v. The Palestinian Interim Self-Gov't Auth*., 422 F. Supp. 2d 96, 102 (D.D.C. 2006), where the court denied a motion to dismiss and reasoned:

> The plain words of Plaintiffs' Complaint make it clear that Defendants' argument has no merit. Plaintiffs allege that the murder of Esh Kodesh Gilmore was "planned and carried out" by several of the individual Defendants, "pursuant to prior authorization, instructions and directives of Defendants PA, PLO and ARAFAT." Compl. ¶ 30. Plaintiffs also allege that Defendants' actions were "intended to intimidate or coerce a civilian population, and to influence the policy of a government by intimidation or coercion, within the meaning of 18 U.S.C. § 2331." *Id.* ¶ 39. These allegations, which must be taken as true at this early stage of the litigation, are more than sufficient to state a claim for international terrorism under the ATA.

The plaintiffs here do not have a PLO or an Arafat to point to as the planners of violence. But they have defendants who support the aims of the Israeli settlers. Defendants know full well the Settlers envision taking the West Bank for Israel by any means, including attacks on non-Jews. Under the ATA, the absence of a

18

Foreign Terrorist Organization ("FTO") like Hamas or the former leader of the PLO is not material. It is the material support for terrorism that matters.

Donors give to the Settlers, as opposed to other possible Jewish beneficiaries, because their purpose is aligned with that of the Settlers—namely, to aggressively annex by force the areas of Judea and Samaria inhabited by non-Jews. The settlements began as (and continue to be in the settlements at issue in this case) inherently an act of aggression.

The key case supporting this lawsuit is *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir 2008) where various Arab charities and individuals were sued under the ATA. In *Boim,* the charitable contributions were made to Hamas, an FTO. That is the major distinction between that case and this one. Defendants here are numerous charities, like those in *Boim*, which give to a number of settlements in the West Bank. None of the settler groups have been declared to be a FTO but that designation is not required under the ATA. The violence of the Settlors, such as "price tag" attacks and the firebombing of the taxicab, which injured the plaintiffs in this case, have been referred to as terrorist attacks by the U.S. State Department and the State of Israel even though no settler group has been designated an FTO. *See Strauss v. Credit Lyonnais, S.A.* 249 F.R.D. 429, 2013 WL 751283 (E.D.N.Y. 2013) (that the French and the EU "have decided that they have insufficient evidence to sanction [the charity] under their

19

own governing law, does not mean that [the charity] was not supporting a terrorist organization for purposes of the ATA").

The District Court concluded that plaintiffs allege no facts that the defendant charities intended or were deliberately indifferent to the fact that the funds they provided could be used to support violent activity. We respectfully disagree. To the contrary, the plaintiffs alleged in considerable detail that defendants' purpose in funding the settler groups is to allow them to take back Judea and Samaria by any means, including violence.

The Complaint meets the plausibility standard for a causal relationship as set forth in *Bell Atlantic Corp v. Twombly,* 550 U.S. 544 (2007) and as discussed in *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013). The Complaint very directly and plausibly alleges that the money transferred by defendants goes directly to the Settlers, who need these funds to afford to live in the West Bank. Without such funding, the Hilltop Youth and others could not engage in the violence condemned as terrorism under the ATA by directly attacking Palestinians and Christians, including American citizens, in an attempt to coerce and intimidate them.

Plaintiffs have standing to bring this lawsuit since the funds defendants wire to the Settlers are fairly traceable to the Settlers just as the plaintiffs had standing in *Rothstein* where the funds were similarly traceable. *See Rothstein*, 708 F.3d at 93 ("the more U.S. currency [the Settlers] possessed, the greater [their] ability to

20

fund [terrorists like the Hilltop Youth] for the conduct of terrorism; and the greater the financial support [terrorists like the Hilltop Youth] received, the more frequent and more violent the terrorist attacks they could conduct. The fact that plaintiffs did not more specifically describe the scale of [defendants'] financial transactions with [the Settlers] as a 'primary' or 'significant' source of [the Settlers'] cash supply is irrelevant.")

The complaint alleges that the Defendants were "a participant" in "terrorism." *In re Terrorist Attacks on September 11, 2001* 714 F.3d 109 (2d Cir 2003) is distinguishable from this case. The complaint in that case *failed* to allege that money was provided *directly* to al Qaeda or that money "actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." 714 F.3d at 124. The complaint here *specifically* alleges that the funds were *directly* transferred by defendants to the Settlers and financed the "Price Tag" and other attacks on individuals and property in the West Bank and Jerusalem.

The complaint also alleges how widely known these attacks were to anyone with any interest in the State of Israel and how the websites of various of the charities openly admit to arming the Settlors who are living in the West Bank which they refer to as The Holy Land. The law on what is culpable knowledge under the ATA is well developed. At a minimum, defendants knew or were indifferent to whether the Settlers they financed were committing terrorist acts.

21

*Boim v. Holyland Found. for Relief & Dev.,* 549 F.2d. 685, 693 (7th Cir. 2008)(en banc) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.").   The Complaint alleges the attacks are widely reported in the press and defendants certainly must be aware of the attacks.  *See also Gill v The Arab Bank*, 893 F.Supp.2d 474, 506 (E.D.N.Y. 2012) ("a defendant who is deliberately indifferent to – that is, reckless with regard to – facts that should put him on notice that his actions are substantially likely to result in harm to American nationals will be more likely [to] have actions be found to be the proximate cause of any subsequent harm to Americans…"). In *Boim,* the Court stated:

> because money is fungible, a defendant's provision of assistance to a terrorist organization does not have to be either a necessary or sufficient cause of the harm suffered by an ATA plaintiff or an ATA plaintiff's decedent in order for a section 2333(a) plaintiff to recover.   *See Boim,* 549 F.3d at 697–98.

This caused some courts to analyze how one measures how much money and how recently it was given in order to show causation.

> The money used need not be shown to have been used to purchase the bullet that struck the plaintiff. A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets. *See id.* at 698 (en banc majority opinion) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1130 (D.C.Cir.2004) (Garland, J.)). The problem

> can be solved by considering relative amounts of contributions and intentions. Thus, a major recent contribution with a malign state of mind would—and should—be enough, as the *Boim* en banc majority contended. But a small contribution made long before the event—even if recklessly made—would not be. The concept of proximate cause is central in imposing a balance.

*Gill v. Arab Bank, PLC*, 891 F. Supp. 2d 335, 367 (E.D.N.Y. 2012). *See also Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664 (S.D. Tex. 2010) (*Boim* "removes a causation requirement and removes an intent, or purpose, or knowledge requirement and only demands awareness that the organization that ends up receiving the funds is a terrorist group.").

The concerns expressed by those Judges are not present in this case. The complaint alleges that regular donations are made for all of the needs of particular settler groups who engage in violence against non-Jews.  It also alleges that the defendants know that their money is used to support the taking of Judea and Samaria from the people who currently live there.  While defendants may claim they do not support the violence that is part of the Settlers' activities, they cannot deny that they know of the violence and are, at best, knowingly indifferent to it. Indeed, as discussed below in the analysis of the ATS claims, defendants have a shared purpose with the Settlers – the taking of Judea and Samaria and Arab parts of Jerusalem from the current inhabitants.

23

The defendants in the *Boim* and subsequent cases claimed that they were giving the money only for education and other purposes and not for terrorism. Since money is fungible, this does not matter under the ATA. Just as all of Hamas' activities do not involve terrorism, not all of the activities of the Settlers involve terrorism. Hamas has its militant wing which engages in terrorism. The Settlers have militants like the "Hilltop Youth" and Rabbis who advocate "the killing of non-Jews."

To borrow from the majority opinion in *Boim*, a knowing donor to the Settlers—that is, a donor who knew its aims and activities—would know that the Settlers were gunning for Palestinians and other non-Jews in the West Bank (unlike some other terrorist groups, the Settlers' terrorism is limited to a specific territory). And "to require proof that the donor *intended* that his contribution be used for terrorism—to make a benign intent a defense—would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent." *Boim,* 549 F.3d at 698-99 (emphasis in original).

As the *Boim* court explained:

"One who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as responsible as the one who commits the act so as to impose liability upon the former to the same extent as if he had

24

performed the act himself."  549 F.3d at 697    (*quoting Keel v. Hainline*, 331 P.2d 397, 401 (Okla. 1958).

By parity of reasoning, the complaint here alleges that providing of the funds is a direct act on the part of the charities which makes them liable because they are encouraging, procuring and promoting all of the Settlers' activities as part of the general plan of the taking of Judea and Samaria, by force if necessary, from the people currently living there for the benefit of Greater Israel.  Plaintiffs' claims are not intended to inject the court into the political process of whether the Settlers should stop building settlements in the West Bank.  We simply urge this Court to reverse the District Court, let this case proceed to discovery and allow plaintiffs to pursue their claims for damages against these defendants.  Suits against the financiers of terrorism are the only effective remedy against the terrorists.  *See Boim,* 549 F.3d at 690-91.

## Point II

### Defendants' U.S.-Based funding of the Settler Groups Supports Jurisdiction Under the ATS

In *Presbyterian Church Of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 259 (2d Cir. 2009), this Court analyzed the ATS and concluded that:

> applying international law, we hold that the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone. Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law… no such consensus exists for imposing

liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law. Indeed, international law at the time of the Nuremberg trials recognized aiding and abetting liability only for purposeful conduct. *Id.* at 259 (emphasis in original and cit. omitted).

In *Talisman,* this Court found no jurisdiction under the ATS because:

> Plaintiffs have provided evidence that the Government violated customary international law; but they provide no evidence that Talisman acted with the purpose to support the Government's offenses. Plaintiffs do not suggest in their briefs that Talisman was a partisan in regional, religious, or ethnic hostilities, or that Talisman acted with the purpose to assist persecution. To the contrary, the actions of the Sudanese government threatened the security of the company's operations, tarnished its reputation, angered its employees and management, and ultimately forced Talisman to abandon the venture. *Id.* at 263.

What is most significant to our case is that in *Talsiman* this Court observed:

> True, intent must often be demonstrated by the circumstances, and there may well be an ATS case in which a genuine issue of fact as to a defendant's intent to aid and abet the principal could be inferred; but in this case, there were insufficient facts or circumstances suggesting that Talisman acted with the purpose to advance violations of international humanitarian law. *Id.* at 264.

We respectfully submit that this is that ATS case and this Court should allow plaintiffs the discovery needed to prove it.

Under this Court's reasoning in *Talisman,* defendants do not have to openly encourage the violence to support jurisdiction under the ATS. They simply need to

26

be shown to share the purpose of these specific Israeli Settler groups in the West Bank that have as their plan the taking of Judea and Samaria, The Holy Land, from the non-Jews living there. The alien plaintiffs can recover under the ATS for the same acts by defendants that allow the U.S. citizen plaintiffs to recover under the ATA. *See, e.g., In re Chiquita Brands Intern., Inc. Alien Tort Statute and Shareholder Derivative Litigation*, 792 F.Supp.2d 1301, 1314 (S.D. Fla. 2011) ("there is no conflict between the ATA's provision of civil remedies for U.S. nationals injured by acts of terrorism and the ATS's provision of civil remedies for aliens injured by violations of international-law norms").

It is the conduct of the actors that determines whether there is a violation of international law and not the label for that conduct. *See, e.g., Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257  (E.D.N.Y. 2007) where "[t]he court explained that its holding was limited to the specific allegations before it, and not based upon a cause of action for 'terrorism' generally." *Almog*,  471 F.Supp.2d at 280 ("[T]here is no need to resolve any definitional disputes as to the scope of the word 'terrorism,' for the Conventions expressing the international norm provide their own specific descriptions of the conduct condemned.  Although the Conventions refer to such acts as 'terrorism,' the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled." *Id.* at 280-81 (cit. omitted)).

The dismissal of the complaints in *Rothstein* and *In Re Terrorist Attacks on September 11, 2001* does not support a dismissal of this case. Today, all countries recognize as "international terrorism" any activities that appear to be intended to intimidate or coerce a civilian population, which is precisely what the Hilltop Youth and the other Settler groups referenced in the complaint intend to do to non-Jews living in the West Bank or Jerusalem.

The non-U.S. plaintiffs are individuals, a mosque and a monastery seeking to recover under the ATS for defendants' financing of what they regard as Illegal Settlements from which Settlers attack them. Whether they are illegal under international law is not an issue in this lawsuit. The issue is whether defendants' purpose in funding and financing the Settlers, which include the Settlers who attacked plaintiffs, is a violation of international law. Plaintiffs seek to prove in regard to this action that the defendants share the vision of the Settlers in all respects, without regard to whether there is violence.

Whether defendants may say they want good causes is not the issue. The issue is whether defendants' funds are also supporting unlawful acts. *See Almog,* 471 F. Supp. 2d at 287 ("acts which in themselves may be benign, if done for a benign purpose, may be actionable if done with the knowledge that they are supporting unlawful acts."). This is what plaintiffs seek to prove is true of defendants. Under international law, defendants can be found liable even though

28

they did not directly perform the underlying acts as long as they provided the money. *See Presbyterian Church of Sudan v Talisman Energy*, 244 F. Supp.2d 289, 320-21 (S.D.N.Y. 2003).

That plaintiffs are seeking to recover from defendants for their direct support of terrorists coming out of the settlements in the West Bank and attacking them should not be surprising. The New York and Israeli press have been writing for years about donations to U.S. charities being given to the violent settler groups such as the Yitzhak Settlement which is known for violent attacks in the West Bank. Indeed, Israel has been trying to stop educational funding for the for the Yitzhak settlement because of attacks by its students. http://www.haaretz.com/news/diplomacy-defense/israel-s-attorney-general-backs-move-to-cut-funding-of-west-bank-yeshiva-due-to-violence-against-palestinians.premium-1.514779

Meanwhile, defendant Central Fund sends tens of millions of dollars to this and other violent settler groups. http://www.haaretz.com/print-edition/features/akiva-eldar-u-s-tax-dollars-fund-rabbi-who-excused-killing-gentile-babies-1.2137.

Defendants seek to persuade the Court that these claims are not actionable because the acts of violence are simply vandalism and graffiti and that they are not as "heinous" as those on 9/11 because they do not involve suicide bombings or

29

because, despite the fire bombings and shootings, no plaintiffs in this action were killed. But that is not the law in America or internationally. The defendants are financing systematic efforts by violent, easily identified settler groups to intimidate or coerce and thereby drive the non-Jewish civilian populations out of the West Bank and East Jerusalem. Plaintiffs have plausibly pled the right to recover from defendants for their "heinous" conduct in supporting terrorism.

While defendants try to diminish the significance of the "price tag" attacks as simply "graffiti" by unknown assailants, it is hard to imagine that defendants do not know the significance of these attacks.  If someone writes "Victory for the Maccabees," a reference to the biblical massacre of Greeks by Jews, on a Greek monastery near Knesset (A-19), this is a threat to kill or drive Christians off the land.

The U.S. charities, through their direct support for the shared purpose with the Settlers of taking Judea and Samaria, are committing the tort of aiding and abetting acts of violence by the settler groups described in the complaint.  The financial support of those who commit violence against non-Jews in the West Bank and Jerusalem is a violation of international law and supports jurisdiction under the ATS.

**Point III**

**The U.S. Supreme Court Overruled This
Court's Decision in *Kiobel*, *sub silentio***

In *Kiobel,* this Court held that there was no subject matter jurisdiction for a lawsuit against a corporation under the ATS.  That was the issue originally presented to the Supreme Court for review.  That issue was never directly addressed in the decision rendered by the Court.  Instead, the Supreme Court affirmed this Court by holding that the ATS had no extra-territorial effect and plaintiff could not show a sufficient U.S. connection to support subject matter jurisdiction.

The District Court held that this Court's holding that corporations cannot be sued under the ATS is binding on it. We respectfully submit that this Court's holding that a corporation cannot be sued under the ATS has been overruled in *Kiobel* and in subsequent cases, *sub silentio*.

In a case where the issue of whether corporations can be sued was carefully reviewed, the Judge analyzed the issue in this manner:

> On January 14, 2014, the Supreme Court issued an opinion in *Daimler AG v. Bauman,* an ATS case arising from allegations that Daimler "collaborated with state security forces to kidnap, detain, torture, and kill" plaintiffs or plaintiffs' families during Argentina's "Dirty War" of the late 1970s and early 1980s. (footnote omitted). The Court concluded that Daimler's contacts with California were insufficient to subject it to personal jurisdiction under California's long-arm statute, because a

31

corporation's "'affiliations with the State' must be 'so continuous and systematic' as to render [it] essentially at home in the forum State." (citation omitted). While *Daimler* noted that plaintiffs' ATS claims were "infirm" in light of *Kiobel II*'s holding on extraterritoriality, the Court made no reference to corporate liability, despite addressing the question of personal jurisdiction over a corporation in an ATS case.

and concluded:

In my April 8 Opinion and Order, I concluded that "corporations are liable in the same manner as natural persons for torts in violation of the law of nations" based on the fact that "[o]n at least nine separate occasions, the Second Circuit has addressed AT[S] cases against corporations without ever hinting—much less holding— that such cases are barred." (citation omitted).

Nonetheless, and despite the unbroken line of controlling precedent, the Second Circuit reached the opposite conclusion just eighteen months later in *Kiobel I*.   But *Kiobel I* is a stark outlier. It is the only opinion by a federal court of appeals, before and after *Kiobel II*, to determine that there is no corporate liability under the ATS. As discussed above, *Kiobel II* either implicitly accepts corporate liability under the ATS or, at the very least, undercuts *Kiobel I*'s rationale and re-opens the question in this Circuit. For the following reasons, I find that corporations may be held liable for claims brought under the ATS.

*In re S. African Apartheid Litig.*, 02 MDL 1499 SAS, 2014 WL 1569423

(S.D.N.Y. Apr. 17, 2014).

Toward the conclusion of the first oral argument before the Supreme Court in *Kiobel*, Judge Kagen took over the questioning.[3]  In essence, Judge Kagen suggested to defendant's attorney that her argument that corporations could not be sued was unsupported.  The reason, Judge Kagen suggested, there was no case stating that a corporation could not be sued under international law was that it was not necessary to have a case stating that.  She illustrated her point by asking the defendant's attorney if there was a case saying that Norwegians could not be sued under international law.  When the attorney for the defendants seemed perplexed by the question, Judge Kagen answered it for her.  She said there is no case because, of course, Norwegians can be sued under international law.  At that point, Justices Scalia and Chief Justice Roberts asked a few questions and the argument concluded.

Thereafter, Chief Justice Roberts recalled the case for argument on the question of whether there was extraterritoriality under the ATS.  Following that argument, the Court in a divided decision concluded that there was no extraterritoriality but made clear that lawsuits based on U.S. conduct could be maintained.  In a concurring opinion, Justice Alito referred to the Supreme Court's holding in *Morrison*[4] which concluded that a lawsuit alleging violations of U.S.

---

[3] Oral argument can be found on the website, www.scotusblog.com at http://www.oyez.org/cases/2010-2019/2011/2011_10_1491 (*Kiobel* Oral Reargument).
[4] *Morrison v. National Australia Bank, Ltd.,* 561 U.S. 247 (2010).

securities laws on a foreign stock exchange could not be maintained under the statutes because they did not provide for extraterritorial application.  On the other hand, as Justice Alito made clear, a lawsuit involving a violation of the Securities laws that took place on a U.S. stock exchange could be maintained even if it involved foreign actors and conduct.

Plaintiffs maintain that, once one reads or listens to the oral argument on the issue of whether corporations could be sued under international law, the decision in *Kiobel,* shows that if the Supreme Court needed to address the issue directly, it would hold that corporations can be sued under international law.  While the Court did not explicitly state that in its decision, only obliquely referring to the fact that "mere corporate presence" is not enough for subject matter jurisdiction, we believe the Court was signaling that it did not believe that there was support for the position that corporations could not be sued under international law.  Indeed, this appears to be the basis for the decision by Justice Roberts to recall the case for argument on the issue of extra-territoriality.

Finally, plaintiffs note that this Court's majority opinion in *Kiobel* is at odds with the view of the other Circuit Courts that have addressed the issue since the Second Circuit's decision, all of which agree with Judge Leval's opinion.  *See, e.g., Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 40-57 (D.C. Cir. 2011); *Flomo v. Firestone National Rubber Co., LLC,* 643 F.3d 1013, 1017-21 (7th Cir. 2011);

34

*Sarei v. Rio Tinto, PLC,* 671 F.3d 736, 747 (9th Cir. 2011), *vacated and remanded on extraterritoriality issue in light of Kiobel Supreme Court decision,* 133 S.Ct. 1995 (2013).  *See also Baloco ex rel. v. Drummond Co., Inc.,* 640 F.3d 1338, 1344-45 (11th Cir. 2011).

## CONCLUSION

For the reasons set forth above, this Court should reverse the District Court's granting of the motion to dismiss under Rule 12(b)(6).

Dated:      New York, New York
            September 8, 2014

                              Respectfully Submitted,
                              **MELITO & ADOLFSEN P.C.**


                    By:    /s/ Louis G. Adolfsen
                           Louis G. Adolfsen (LA 5431)
                           233 Broadway
                           New York, New York 10279
                           Telephone: (212) 238-8900
                           Facsimile:  (212) 238-8999
                           E-mail: lga@melitoadolfsen.com
                           S. Dwight Stephens (SS 2161)
                           Rania Shoukier (RS 7317)
                           Michael F. Panayotou (MP 7744)
                           E-mail: sds@melitoadolfsen.com
                           E-mail: Shoukier@arablegalusa.com
                           E-mail: mfp@melitoadolfsen.com
                           *Attorneys for Plaintiffs*

108382

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8,361 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B) (iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: September 8, 2014

Respectfully Submitted,

**MELITO & ADOLFSEN P.C.**

By:    /s/ Louis G. Adolfsen
Louis G. Adolfsen (LA 5431)
233 Broadway
New York, New York 10279
Telephone: (212) 238-8900
Facsimile:  (212) 238-8999
E-mail: lga@melitoadolfsen.com
*Attorneys for Plaintiffs*

36

**SPECIAL APPENDIX**

## TABLE OF CONTENTS

PAGE

Opinion and Order, dated May 5, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA- 1

Judgment, dated May 6, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA- 11

**SPA-1**

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 05/05/2014           │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
AYDA HUSAM AHMAD et al.,                         :
:
                              Plaintiffs,        :           13 Civ. 3376 (JMF)
:
              -v-                                :           OPINION AND ORDER
:
CHRISTIAN FRIENDS OF ISRAELI COMMUNITIES         :
et al.,                                          :
:
                              Defendants.        :
:
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        This case involves an attempt to collect money damages from five American

organizations for injuries sustained in connection with the Israeli-Palestinian conflict.  Plaintiffs

are thirteen residents of the West Bank who were allegedly injured by Israeli citizens also living

in the West Bank, referred to in the Amended Complaint as "the Settlers."  Plaintiffs bring

claims under Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350, based on Defendants' financial support for the Settlers.  Defendants

move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  (Docket No. 15).  For the reasons that follow, the motion is GRANTED.

                                    **BACKGROUND**

        The following facts are drawn from the Amended Complaint and are assumed to be true

for purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471,

475 (2d Cir. 2009).

        As noted, Plaintiffs in this action are thirteen men and women who live in the West Bank,

a territory the Amended Complaint refers to as "Occupied Palestine."  (Am. Compl. (Docket No.

8) ¶ 1).  Of the thirteen Plaintiffs, two are American citizens (the "American Plaintiffs"), ten are

Palestinians, and one is Greek.  (*Id.* ¶¶ 23-33).   Plaintiffs claim that the territory where they

reside, or at least a portion of it, is "within the internationally-recognized borders of the future

Palestinian state." (*Id.* ¶¶ 1, 56).

As alleged in the Amended Complaint, the common thread among Plaintiffs is that they

have been subject to attacks by a group they refer to as "the Settlers."  (*Id.* ¶ 1).  The Settlers, as

defined by the Amended Complaint, are Israeli citizens who have built and live in communities

— or "settlements" — in the West Bank.  Plaintiffs estimate that there are "over half a million"

Settlers and allege that the existence of the settlements violates international law.  (*Id.* ¶¶ 56-58).

The attacks on Plaintiffs took varied forms, from stonings (*id.* ¶¶ 23, 33), to firebombings (*id.* ¶

26), to shootings (*id.* ¶¶ 30, 33), to beatings (*id.* ¶¶ 31-32), to the destruction of property (*id.* ¶¶

24, 32) and vandalism (*id.* ¶¶ 27-29).  According to the Amended Complaint, the attacks are

intended to "coerce, intimidate, and influence the Israeli government and public and thereby

ultimately bring the expulsion of the Palestinian residents from Occupied Palestine."  (*Id.* ¶ 66).

Defendants — Christian Friends of Israeli Communities, the Hebron Fund, Inc., the

Central Fund of Israel, One Israel, and American Friends of Ateret Cohanim — are organizations

that have provided the Settlers with financial support.  The organizations, identified in the

Amended Complaint as "purported charities," are based in the United States, and they collect

donations totaling "millions of dollars" that they wire "directly to the Settlers and the Illegal

Settlements."  (*Id.* ¶¶ 2, 68, 93).  The funds are used to "build and maintain the Illegal

Settlements, illegally take land in Occupied Palestine, to support the attacks by the Settlers on

Palestinians living in Occupied Palestine, and to support the terrorist acts of the Settlers against

Palestinians and other persons in Occupied Palestine."  (*Id.* ¶ 8).

Those wire transfers form the basis for Plaintiffs' ATA and ATS claims, claims they first asserted on May 17, 2013.  (*Id.* ¶¶ 85-89, 93-95, 109-110; Compl. (Docket No. 1)).  Plaintiffs amended their Complaint approximately one month later (Am. Compl.), and Defendants moved to dismiss the Amended Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on September 12, 2013 (Docket No. 15).

### RULE 12(B)(6) STANDARD

A motion pursuant to Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint.  *See ATSI Commnc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  To survive such a motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### DISCUSSION

Applying those standards here, Plaintiffs' claims fail as a matter of law.  The Court first addresses the ATA claims, which are brought solely by the American Plaintiffs, and then turns to the ATS claims, which are brought on behalf of all Plaintiffs.

### A.  The ATA Claims

The ATA provides that "[a]ny national of the United States injured . . . by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United

States and shall recover threefold the damages he or she sustains."  18 U.S.C. § 2333(a).  Here, the American Plaintiffs allege that Defendants committed predicate acts of "international terrorism" by violating two federal statutes: Title 18, United States Code, Sections 2339A and 2339C.  (Am. Compl. ¶ 86).  Section 2339A prohibits the "provi[sion] of material support or resources" to terrorists, and Section 2339C prohibits the financing of terrorism.  *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013) (stating that violations of Section 2339C "are considered to be acts of 'international terrorism' under Section 2333(a)"); *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("If the plaintiffs could show that [Defendants] violated . . . section 2339A . . . that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331.").[1]  To state a claim under the ATA, however, the American Plaintiffs must not only allege plausible violations of one or the other of those provisions, but they must also adequately plead "the requisite mental state[] and causation."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 502 (E.D.N.Y. 2012).  They have failed to do so.

### 1.  Scienter

First, the American Plaintiffs have failed to plausibly allege the requisite mental state to state a claim under the ATA.  It is well established that, to be liable under the ATA, "a party must engage in knowing misconduct."  *Strauss*, 925 F. Supp. 2d at 427.  Specifically, where the predicate act of international terrorism is the provision of material support to terrorists, *see* 18 U.S.C. § 2339A, the defendant must have known or intended that the support would be used in

---

[1]    The American Plaintiffs also invoke Section 2339B, which prohibits the "provi[sion] of material support or resources" to certain designated foreign terrorist organizations.  (Am. Compl. ¶ 86).  The Amended Complaint, however, makes no allegation that "the Settlers" are a designated foreign terrorist organization.  *See* 18 U.S.C. § 2339B(g)(6).  Accordingly, the Court analyzes the American Plaintiffs' claims only under Sections 2339A and 2339C.

SPA-5

preparation for, or in carrying out, violations of certain federal criminal statutes. *See Gill*, 893 F. Supp. 2d at 504. Where the predicate act is the financing of terrorism, *see* 18 U.S.C. § 2339C, the defendant must have intended or known that such funds would be used to carry out terrorist attacks. *See Gill*, 893 F. Supp. 2d at 504. In order to trigger liability under the ATA, the recipient of a defendant's support need not be a designated foreign terrorist organization. (*See* Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss ("Pls.' Mem.") (Docket No. 18) 12). But there must be some evidence — for instance, that the recipients of the aid have publicly stated terrorist goals or are associates of established terrorist organizations — from which a finder of fact could conclude that the defendant either knew, or was deliberately indifferent to the possibility, that it was supporting international terrorism. *See Strauss*, 925 F. Supp. 2d at 428 (holding that civil liability under the ATA requires a defendant to at least "kn[o]w there was a substantial probability that [it] was supporting terrorists"); *see also, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 936 F. Supp. 2d 100, 114 (E.D.N.Y. 2013) (dismissing, on summary judgment, an ATA claim where "none of the payments that [defendant-bank] processed for [suspected affiliate of Hamas] went to United States or British designated terrorist organizations").

In this case, the Amended Complaint alleges no facts suggesting that Defendants were aware — or even deliberately indifferent to the possibility — that the financial support they provided to "the Settlers" would be used to support any violent activity. The American Plaintiffs allege that Defendants possessed "the specific purpose and intention of enabling and assisting . . . hundreds of terrorist attacks against Palestinians" (Am. Compl. ¶ 69), but that allegation is entirely conclusory. The American Plaintiffs do not (and cannot) allege that the Settlers are a designated terrorist organization. Nor do they allege that the Settlers have publicly stated terrorist goals or are associates of established terrorist organizations. *Cf. Boim*, 549 F.3d at 693-

94 (noting that a knowing donor to Hamas "would know that Hamas was gunning for Israelis . . . and that donations to Hamas . . . would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel"); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) (holding that the plaintiffs adequately alleged scienter where the complaint alleged that the defendant's client had engaged in fundraising for Hamas, where the client's parent organization had been designated as a Specially Designated Global Terrorist by the United States government, and where "numerous . . . publicly available sources of information suggested that [it] was funneling money to terrorist organizations"); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 630 (E.D.N.Y. 2006) (holding that plaintiffs stated an ATA claim against a bank for providing services to a foundation that had been designated by Israel as a terrorist organization, and whose accounts had been frozen by a British regulator on evidence that it channeled money to Hamas).

To be sure, the Amended Complaint alleges that "[t]he Settlers have openly, publicly and repeatedly acknowledged having a policy that is referred to as 'Price Tag' attacks" — a policy of "exacting a 'price' against Palestinian targets or Israeli security forces in response to actions by the Israeli government" by engaging in "acts of vandalism."  (Am. Compl. ¶¶ 77-78).  But that allegation does not suffice for present purposes.  For one thing, the Amended Complaint alleges no details as to when or how the Settlers professed such a policy — or how an unorganized group of five hundred thousand people could even do so in the first place.  Moreover, the assertion is in tension with an assertion found earlier in the Amended Complaint, that "[t]here are Settler groups who have adopted a so-called 'Price Tag' policy."  (Am. Compl. ¶ 59 (emphasis added)).  More broadly, the Amended Complaint does allege that *some* of the Settlers committed terrorist attacks (Am. Compl. ¶¶ 66, 79, 81), that those attacks were well-publicized (*id.* ¶¶ 70-

74, 76), and that certain individuals, organizations, and sub-groups among the Settlers publicly endorse terrorism (*id.* ¶¶ 59, 62-67). But the Amended Complaint never contends that Defendants gave money directly to those specific individuals or groups. Nor does it even specify what proportion of the "over half a million" Settlers those individuals and groups comprise. (*Id.* ¶ 58). In the absence of such details, there are simply no facts alleged that could provide the Court with a basis to infer that Defendants knew, or were deliberately indifferent to, the fact that the wire transfers would be used to support terrorist activity.

### 2. Proximate Causation

The Amended Complaint also fails to allege facts supporting the third element of an ATA claim: causation. It is well established that an ATA plaintiff must plead proximate causation. *See Rothstein v. UBS AG*, 708 F.3d 82, 94-96 (2d Cir. 2013); *see also In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 123-24 (2d Cir. 2013). As a general matter, that requires Defendants' actions to have been "'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Strauss*, 925 F. Supp. 2d at 432 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). In the context of an ATA action, proximate causation requires non-conclusory, plausible allegations of "a proximate causal relationship between the cash transferred . . . and the terrorist attacks . . . that injured plaintiffs." *Rothstein*, 708 F.3d at 97.

The Amended Complaint lacks such allegations for reasons similar to those discussed with respect to scienter. As was the case in *Rothstein*, "[t]he Complaint does not allege that [Defendants were] . . . participant[s] in the terrorist attacks that injured plaintiffs." *Rothstein*, 708 F.3d at 96. And although it does allege that Defendants "provided money to [the Settlers and settlements]," *id.*, it does not claim that they provided money to the specific organizations or

7

individuals that engaged in terrorist activities, *cf. id.* at 97 ("[T]he fact remains that Iran[, the recipient of the funds,] is a government, and as such it has many legitimate agencies, operations, and programs to fund.").  In fact, the Amended Complaint does not even identify which individuals or organizations were responsible for the attacks that injured the American Plaintiffs — the only Plaintiffs who have standing to bring claims under the ATA — other than by stating that one was stoned by "[t]he Settlers" (Am. Compl. ¶ 23) and that the other was attacked by "a group of Settlers" (*id.* ¶ 24).  Essentially, the Amended Complaint alleges that Defendants transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs.  Those allegations are not even sufficient to show but-for causation, *see Rothstein*, 708 F.3d at 97 (noting the Complaint's failure to allege that "if [the defendant] had not transferred U.S. currency to Iran, Iran . . . would not have funded the attacks in which plaintiffs were injured"), let alone the more demanding standard of proximate causation.

**B.  The ATS Claims**

     The Court turns then to Plaintiffs' ATS claims.  The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The ATS is "a jurisdictional statute," whose "grant is best read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).  Plaintiffs claim that their claims are cognizable under the ATS because Defendants violated international law by "financing the Settlers, . . . includ[ing] the Settlers who attacked Plaintiffs."  (Pls.' Mem. 18).  The claims fail for two independent reasons.

First, Plaintiffs fail to plausibly allege that Defendants violated international law. Implicitly, Plaintiffs' ATS claims are grounded on an aiding-and-abetting theory of liability. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009) (holding that plaintiffs "may plead a theory of aiding and abetting liability under the ATS" (internal quotation marks and alterations omitted)). The mental state required for aiding-and-abetting liability under the ATS, however, is "purpose rather than knowledge alone." *Id.* at 259. In other words, for a defendant to be held liable under the ATS for a violation of international law committed by another, that defendant must not only provide "assistance . . . which has a substantial effect on the perpetration of the crime," but must also "do[] so with the *purpose* of facilitating the commission of that crime." *Id.* at 258 (emphasis added and internal quotation marks omitted). Having already found that the allegations in the Amended Complaint are insufficient to establish that Defendants possessed knowledge that the funds transferred to the Settlers would be used to aid terrorist activity, it follows *a fortiori* that the allegations are insufficient to establish that Defendants intended for their funds to be used in such a manner.

Second, the law in the Second Circuit is clear that the ATS does not confer jurisdiction over claims brought against corporations. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013). In *Kiobel*, the Second Circuit held that because "customary international law . . . has never extended the scope of liability [for a violation of a given norm] to a corporation," claims against corporations "fall outside the limited jurisdiction provided by the ATS." *Id.* The Supreme Court affirmed the decision, albeit on other grounds — namely, that the presumption against extraterritorial application of domestic statutes applies to the ATS. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013). Nevertheless, the Second Circuit's holding regarding corporate

liability under the ATS remains binding on this Court, and the Supreme Court's remark that "mere corporate presence" in the United States would not displace the presumption against extraterritoriality, *id.* at 1669, does not suggest otherwise.  *See Tymoshenko v. Firtash*, No. 11 Civ. 2794 (KMW), 2013 WL 4564646, at *3 (S.D.N.Y. Aug. 28, 2013) (rejecting that very argument because "[t]his Court is bound by the Second Circuit decision unless and until the Supreme Court or an en banc panel of the Second Circuit unambiguously rejects its rationale"). Here, all Defendants are corporations or corporate-type entities.  (*See* Am. Compl. ¶¶ 34, 38, 42, 45, 47).[2]  Accordingly, Plaintiffs' ATS claims "fall outside [the statute's] limited jurisdiction." and must be dismissed.  *Kiobel*, 621 F.3d at 120.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED, and the Amended Complaint is dismissed.  The Clerk of Court is directed to terminate Docket No. 15 and to close the case.

SO ORDERED.

Dated: May 5, 2014
New York, New York

JESSE M. FURMAN
United States District Judge

---

[2]    Plaintiffs assert in their Surreply that Defendant Central Fund of Israel "appears to be unincorporated" (Pls.' Sur-Reply Mem. Law Opp'n Defs.' Mot. Dismiss ("Pls.' Surreply") (Docket No. 23) 1), but that assertion is in conflict with the allegation in the Amended Complaint — which the Court is required to accept as true, *see LaFaro*, 570 F.3d at 475 — that "Defendant Central Fund of Israel is believed to be a New York Corporation."  (Am. Compl. ¶ 42).  In any event, the assertion is irrelevant for purposes of this motion, as no individual has been named as a Defendant in this lawsuit, and there is no indication that the Second Circuit's decision in *Kiobel* is limited to corporations, as opposed to other abstract juridical entities.  *See Kiobel*, 621 F.3d at 119 (noting that "the principle of individual liability for violations of international law has been limited to natural persons — not 'juridical' persons *such as* corporations," and citing the Nuremberg tribunal's statement that "crimes against international law are committed by men, not by *abstract entities*") (emphases added)).

10

SPA-11

```
┌──────────────────────────────────────┐
│ USDC SDNY                            │
│                                      │
│ DOCUMENT                             │
│                                      │
│ ELECTRONICALLY FILED  05/06/201     │
└──────────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
Ayda Husam Ahmad et al.,

                Plaintiffs,                       13 **CIVIL** 3376 (JMF)

            -against-                           **JUDGMENT**

Christian Friends Of Israeli Communities et al.,
                                Defendants.
------------------------------------------------------------X


       Defendants' having moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and the matter

having come before the Honorable Jesse M. Furman, United States District Judge, and the Court,

on May 5, 2014, having rendered its Opinion and Order (Doc.# 25) granting Defendants' motion to

dismiss and dismissing the amended complaint, directing the Clerk of Court to terminate Docket No.

15 and to close the case, it is,

       **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated May 5, 2014, Defendants' motion to dismiss is granted and the

amended complaint is dismissed; the Clerk of Court is directed to terminate Docket No. 15 and to

close the case.

**Dated:** New York, New York
        May 6, 2014

                                     **RUBY J. KRAJICK**
                              _____
                                  **Clerk of Court**
        **BY:**    _____
                                   **Deputy Clerk**